NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANASTASIYA FERNANDEZ, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES NATIONAL PARK SERVICE,<br><br>Defendant. | Civil Action No. 21-15003 (GC) (TJB)<br><br>**MEMORANDUM OPINION** |

**CASTNER, District Judge**

This matter comes before the Court on motion of the National Park Service (NPS) to dismiss the Complaint of Plaintiffs Anastasiya Fernandez and her husband, Jaime Fernandez, for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure (Rule) 12(b)(1). (ECF Nos. 1, 24.) The Fernandezes opposed, and NPS replied. (ECF Nos. 26, 27.) The Court carefully considered the parties' submissions and decides the motion without oral argument pursuant to Rule 78(b) and Local Civil Rule 78.1(b). For the reasons set forth below, and other good cause shown, NPS's motion is **GRANTED**.

**I.    BACKGROUND**

This action arises from Anastasiya's trip and fall at "Sandy Hook," a national recreation area managed by NPS, a federal agency.[1]

---

[1] On a factual attack on subject-matter jurisdiction, such as NPS's, "the court may consider evidence 'outside the pleadings,' including 'affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction.'" *Fort v. United States*, Civ. No. 22-583, --- F. Supp. 3d ----, 2024 WL 228935, at *6 (D.N.J. Jan. 22, 2024) (quoting *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014); then *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997)).

### A. Factual Background

In August 2019, the Fernandezes spent the day at Beach D of Sandy Hook to celebrate a friend's birthday. (ECF No. 1 ¶¶ 10-11; Pl. Dep. 23:25-24:3.) After sunset that evening, the Fernandezes decided to return home. Before leaving, Anastasiya went to the restroom located in the developed area of Beach D. On her walk back to the parking lot, Anastasiya tripped on a step and fell, injuring her right foot. (ECF No. 1 ¶¶ 12-14; Pl. Dep. 36:7-19, 42:9-18.) She alleges that inadequate lighting caused her to miss the step. (ECF No. 1 ¶ 13.) The only artificial light in that area came from the restroom facilities. (Pl. Dep. 44:17-46:25; McCarthy Decl. ¶ 56.)

Sandy Hook has been designated by Congress as a unit of the Gateway National Recreation Area. (McCarthy Decl. ¶¶ 1, 3.) It "features various natural environments that are a home to a variety of animals, plants, amphibians, insects, and other creatures." (*Id.* ¶ 5.)[2] Congress tasked NPS with maintaining these natural environments.[3] (*Id.* ¶ 14.) NPS does so following

---

To these ends, NPS submits declarations of Peter McCarthy ("McCarthy Decl."), who works for NPS as the longtime unit manager of Sandy Hook and reports to the superintendent of the Gateway National Recreation Area, at ECF No. 24-3; and Patricia Rafferty ("Rafferty Decl."), who works for NPS as the resource stewardship division manager at Gateway, at ECF No. 24-4. Excerpts from Anastasiya's deposition ("Pl. Dep.") are at ECF Nos. 24-5 and 26-1.

[2]    Congress established the Gateway National Recreation Area "in order to preserve and protect for the use and enjoyment of present and future generations an area possessing outstanding natural and recreational features." 16 U.S.C. § 460cc.

[3]    *See* 16 U.S.C. § 460cc-2(a) ("[T]he Secretary may utilize such statutory authority available to him for the conservation and management of wildlife and natural resources as he deems appropriate to carry out the purposes of this subchapter."); *see also* 54 U.S.C. § 100101 (Organic Act) (formerly 16 U.S.C. § 1) (charging NPS to "conserve the scenery, natural and historic objects, and wild life in the [National Park] System units and to provide for the enjoyment of the scenery, natural and historic objects, and wild life in such manner and by such means as will leave them unimpaired for the enjoyment of future generations").

management policies and other written guidance.  (*Id.* ¶¶ 15-17, Ex. 1 (NPS Management Policies) § 9.1 (General).)  Relevant parts of the policies are discussed below.

### B. Procedural History

The Fernandezes sued NPS for negligence (Count I) and loss of consortium (Count II).  After discovery closed, NPS moved to dismiss for lack of subject-matter jurisdiction for three reasons.  *First*, the Fernandezes' claims are barred by the discretionary function exception to the Federal Torts Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680.  *Second*, the United States is immune from suit under the New Jersey Landowner Liability Act (NJLLA), N.J. Stat. Ann. § 2A:42A-3.  *Finally*, Jaime Fernandez did not exhaust his administrative remedies.

## II. LEGAL STANDARD

### A. Rule 12(b)(1)—Lack of Subject-Matter Jurisdiction

Rule 12(b)(1) permits a defendant to move at any time to dismiss the complaint for lack of subject-matter jurisdiction on either facial or factual grounds.  *Gould Electronics Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

A facial challenge asserts that "the complaint, on its face, does not allege sufficient grounds to establish subject matter jurisdiction."  *Iwanowa v. Ford Motor Co.*, 67 F. Supp. 2d 424, 438 (D.N.J. 1999).  In analyzing a facial challenge, a court "must only consider the allegations of the complaint and documents attached thereto, in the light most favorable to the plaintiff."  *Gould Electronics Inc.*, 220 F.3d at 176.  "A court considering a facial challenge construes the allegations in the complaint as true and determines whether subject matter jurisdiction exists."  *Arosa Solar Energy Sys., Inc. v. Solar*, Civ. No. 18-1340, 2021 WL 1196405, at *2 (D.N.J. Mar. 30, 2021).

A factual challenge, on the other hand, "attacks allegations underlying the assertion of jurisdiction in the complaint, and it allows the defendant to present competing facts."  *Hartig Drug*

*Co. Inc. v. Senju Pharm. Co.*, 836 F.3d 261, 268 (3d Cir. 2016). The "trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case" and "the plaintiff will have the burden of proof that jurisdiction does in fact exist." *Petruska v. Gannon Univ.*, 462 F.3d 294, 302 n.3 (3d Cir. 2006) (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891 (3d Cir. 1977)). "Therefore, a 12(b)(1) factual challenge strips the plaintiff of the protections and factual deference provided under 12(b)(6) review." *Hartig Drug Co.*, 836 F.3d at 268. Regardless of the type of challenge, the plaintiff bears the "burden of proving that the court has subject matter jurisdiction." *Cottrell v. Heritages Dairy Stores, Inc.*, Civ. No. 09-1743, 2010 WL 3908567, at *2 (D.N.J. Sep. 30, 2010) (citing *Mortensen*, 549 F.2d at 891).

### III.   DISCUSSION

#### A.   Discretionary Function Exception to FTCA

The FTCA allows plaintiffs to bring state-law tort suits against the federal government. *Brownback v. King*, 592 U.S. 209, 210-11 (2021) (citing 28 U.S.C. §§ 2674, 1346(b)). But that right has exceptions. The "discretionary function exception," invoked here, "retains the Government's immunity for '[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved be abused.'" *Xi v. Haugen*, 68 F.4th 824, 838 (3d Cir. 2023) (quoting 28 U.S.C. § 2680(a)). The exception aims to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Baer v. United States*, 722 F.3d 168, 172 (3d Cir. 2013) (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)).

In determining whether the exception applies, the Court starts by identifying the conduct at issue—here, the decision on the amount of lighting to provide where Anastasiya fell. *See S.R.P.*

4

*ex rel. Abunabba v. United States*, 676 F.3d 329, 332 (3d Cir. 2012) (citing *Merando v. United States*, 517 F.3d 160, 165 (3d Cir. 2008)).

To determine if conduct fits within the discretionary function exception, a court applies a two-part test. *First*, the conduct must be discretionary, meaning that it involves "an element of judgment or choice." *Xi*, 68 F.4th at 838 (quoting *United States v. Gaubert*, 499 U.S. 315, 316 (1991)). Without judgment or choice—"such as where a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow'"—"the exception is inapplicable because the conduct is not discretionary." *Id.* (quoting *Gaubert*, 499 U.S. at 322) (some quotation marks omitted). *Second*, if the conduct involves judgment or choice, the court determines "whether that judgment is of the kind that the . . . exception was designed to shield." *Id.* (quoting *Gaubert*, 499 U.S. at 322-23). The "focus of the inquiry is not on the agent's subjective intent in exercising the discretion conferred by statute or regulation, but on the nature of the actions taken and on whether they are susceptible to policy analysis." *Abunabba*, 676 F.3d at 333 (quoting *Gaubert*, 499 U.S. at 325).

"[I]f a regulation allows the employee discretion, the very existence of the regulation creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations." *Baer*, 722 F.3d at 172-73 (quoting *Gaubert,* 499 U.S. 315, 324 (1991)); *see U.S. Fid. & Guar. Co. v. United States*, 837 F.2d 116, 120 (3d Cir. 1988) ("If governmental conduct falls within the discretionary function exception, it is irrelevant whether the United States abused its discretion or acted negligently."). That presumption is rebuttable if "the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Cestonaro v. United States*, 211 F.3d 749, 755 n.4 (3d Cir. 2000) (quoting *Gaubert*, 499 U.S. at 324-25).

5

1. <u>Discretionary conduct</u>

The statutory landscape[4] and NPS policies make clear that decisions about whether or where to install artificial lighting are discretionary. (*See* NPS Mgmt. Policies §§ 4.10, 8.2.5.1.) According to its policies, NPS maintains visitor safety within the "primary—and very substantial—constraint imposed by the Organic Act": "that discretionary management activities may be undertaken only to the extent that they will not impair park resources and values." (McCarthy Decl. ¶ 19; NPS Mgmt. Polices § 8.2.5.1 (Visitor Safety).) Decisions about "public safety concerns"—for example, whether or where to install artificial lighting—are delegated to "the discretion of superintendents and other decision-makers at the park level" and are "made through the planning process." (NPS Mgmt. Polices §§ 8.2.5.1, 4.10 (Lightscape Management); McCarthy Decl. ¶¶ 20-24.) The NPS Director's Order 50C, released May 7, 2010 and entitled Public Risk Management Program, "supplement[s]" the Management Policies § 8.2.5.1 and confirms that the means by which public safety concerns are to be addressed in each park falls under the discretion of park officials. (Rafferty Decl. ¶ 26, Ex. B (DO-50C), ECF No. 24-4 at 60-73.[5])

The Fernandezes do not contest this point. (*See* ECF No. 26 at 6 (recognizing that "a balance needs to be struck with the environment and visitors who occupied the facility when open").[6]) Nor do they cite a "federal statute, regulation, or policy" mandating specific action by NPS for artificial lighting. The Court therefore finds that NPS's decision about whether to provide

---

[4]    *See* nn.2-3 above.

[5]    Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

[6]    Page numbers for record cites (i.e., "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

6

artificial lighting where Anastasiya fell was discretionary. *See Abunabba*, 676 F.3d at 335 (finding that a previous version of NPS policies "clearly vest local NPS officials with broad discretion to develop appropriate responses to natural hazards").

### 2. Kind of conduct to be shielded

Again, "[o]nly those decisions 'susceptible to policy analysis' are protected by the exception." *Abunabba*, 676 F.3d at 336 (quoting (quoting *Gaubert,* 499 U.S. at 325). NPS must establish that its discretionary conduct is "grounded in the policy of the regulatory regime" and "based on the purposes that the . . . regime seeks to accomplish." *Id.* (quoting *Gaubert,* 499 U.S. at 325 n. 7). In other words, a "rational nexus" must exist between NPS's decision and "social, economic, and political concerns." *Id.* (quoting *Cestonaro*, 211 F.3d at 759). The Court finds that NPS has met its burden—the decisions about artificial lighting are "susceptible to policy analysis." *Id.* at 333 (quoting *Gaubert*, 499 U.S. at 325).

NPS submits that decisions about changing the park's natural or cultural resources, including whether to install artificial lighting, are made by the superintendent of Gateway with input and recommendations from Gateway's project review committee. (McCarthy Decl. ¶¶ 1-2, 25-26.) Following Superstorm Sandy in 2012, the superintendent decided, in consultation with the project review committee, to demolish a food concession building at the developed area of Beach D (where Anastasiya fell) because of permanent damage to the building. (*Id.* ¶ 28.) Though the food concession building was popular with Sandy Hook visitors, the superintendent opted to "convert the space into an area that better supported the natural environment at Sandy Hook." (*Id.* ¶¶ 30-31; *see* Rafferty Decl. ¶¶ 34-35.) The demolition was completed by August 2019, when Anastasiya fell, though the reclamation and planting process was still underway. (McCarthy Decl. ¶ 42.)

7

According to McCarthy, who was "involved in the planning decisions for the Beach D concession demolition and reclamation," "adding additional lighting at the Beach D Complex would have conflicted with the Superintendent's informed decision to remove the former concession space to support the natural environment, and it would not have supported NPS Management Policies § 4.10 on Lightscape Management." (McCarthy Decl. ¶¶ 38-39.) For example, "lightscape management at Sandy Hook can have important impacts on wildlife, including bird migrating along the Atlantic Flyway." (*Id.* ¶ 40.)

On lightscape management, NPS policies provide the following guidance:

> Improper outdoor lighting can impede the view and visitor enjoyment of a natural dark night sky. Recognizing the roles that light and dark periods and darkness play in natural resource processes and the evolution of species, the [NPS] will protect natural darkness and other components of the natural lightscape in parks. To prevent the loss of dark conditions and of natural night skies, the [NPS] will minimize light that emanates from park facilities, and also seek the cooperation of park visitors, neighbors, and local government agencies to prevent or minimize the intrusion of artificial light into the night scene of the ecosystems of parks.

[(NPS Mgmt. Policies § 4.10; *see* Rafferty Decl. ¶ 24.)]

NPS also points to its Night Skies program, which "seeks [to] protect the nighttime views and environments from light pollution, which is the introduction of artificial light, either directly or indirectly, into the natural environment." (Rafferty Decl. ¶ 27.)[7] Rafferty, whose team was involved in the decision on the Beach D project, says she "supported reclamation of this area for natural plantings and believe that the plan for lighting the area balances the needs of visitors with NPS's policies concerning low lighting and Night Skies." (*Id.* ¶¶ 35, 40.)

---

[7]   *Available at* https://www.nps.gov/subjects/nightskies/management.htm (last visited May 31, 2024).

Minding these policies, the superintendent "elected to maintain the existing lighting at the Beach D Complex through the exercise of her discretion . . . and based on the planning discussions, budget resources, and other considerations that went into the planning for the Beach D demolition and reclamation project." (McCarthy Decl. ¶ 41; *see* Rafferty Decl. ¶ 35.)

The Fernandezes offer little to discredit, much less rebut, NPS's explanation. They counter that the accident area "was not part of an effort to preserve any portion of the natural beauty of the facility [or] to protect any species which may inhabit the same." (ECF No. 26 at 7.) But as NPS asserts, the Fernandezes rely only on their observation that the accident area "was a developed area of the facility, housing not only restrooms, but also an area used for a snack concession." (*Id.* at 6-7, Ex. B; ECF No. 27 at 1-2.) Beyond that observation, they argue that "in balancing the concerns of the safety of its patrons and allowing the public to use this facility," NPS "could have" provided some artificial lighting after sunset or required patrons to leave the beach before it was too dark to see. (ECF No. 26 at 7.) "These simple measures," the Fernandezes say, can prevent accidents like Anastasiya's. (*Id.*) Perhaps, but negligence alone is not enough to rebut the presumption that discretionary conduct was meant to be shielded by the exception. *See U.S. Fid. & Guar. Co.*, 837 F.2d at 120 ("If governmental conduct falls within the discretionary function exception, it is irrelevant whether the United States . . . acted negligently."). The Fernandezes' bare disagreement with or skepticism of NPS's discretionary decision cannot rebut the presumption that the decision was grounded in the regulation's policy considerations and thus deserves immunity under the exception.

Other courts have applied the discretionary function exception in cases involving lighting in federally managed outdoor recreation areas. *See, e.g.*, *Dierkes v. United States*, 2021 WL 4620958 (N.D. Cal. May 7, 2021) (dismissing a complaint that deficient lighting at Golden Gate

9

National Recreation Area caused the plaintiff to fall); *Gabriel v. United States*, 2009 WL 22289 (M.D. Fla. Jan. 2, 2009) (dismissing a complaint that a complete lack of lighting at Castillo de San Marcos National Monument caused the plaintiff to fall); *Sharp ex rel. Est. of Sharp v. United States*, 401 F.3d 440 (6th Cir. 2005) (dismissing a complaint that a lack of lighting at Huron National Forest resulted in a death).[8]

In sum, the Court finds that NPS's discretionary decision not to install artificial lighting where Anastasiya fell was grounded in policies concerning lightscape management and maintenance of Sandy Hook's natural environment. As a result, the discretionary function exception shields NPS from the Fernandezes' claims. The Court therefore lacks subject-matter jurisdiction over this action.[9]

---

[8] NPS distinguishes this case from *Cestonaro v. United States*, where the Court of Appeals rejected the discretionary function exception's application to claims arising from a deadly assault in an NPS-owned parking lot that was a known crime spot. 211 F.3d 749 (3d Cir. 2000). (ECF No. 24-2 at 22.) In *Cestonaro*, unlike here, NPS did not show that its discretionary decisions about warnings and lighting in the parking lot were "rooted in its policy objectives." 211 F.3d at 757. The record here also makes clear that unlike the parking lot in *Cestonaro*, the accident area was not a known danger. (*See* McCarthy Decl. ¶ 59 ("NPS has no records of visitor complaints regarding failed or insufficient lighting at the Beach D parking area in the weeks up to and including August 11, 2019."); *id.* ¶ 61 ("To my knowledge, during my time as the Unit Manager at Sandy Hook, there have been no instances of a visitor other than the Plaintiff here claiming that insufficient lighting at the Beach D parking lot or the Beach D Complex caused a fall and injury.").)

[9] Because the Court dismisses this case under the discretionary function exception to the FTCA, it need not address NPS's NJLLA argument or Jaime Fernandez's loss-of-consortium claim. *See Anariba v. Dir. Hudson Cnty. Corr. Ctr.*, 17 F.4th 434, 449 (3d Cir. 2021) (reiterating "the cardinal principle of judicial restraint – if it is not necessary to decide more, it is necessary not to decide more" (quoting *PDK Laby's, Inc. v. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) (Roberts, J., concurring in part and concurring in the judgment))); *Gabriel*, 2009 WL 22289, at *7 n.4 (noting after dismissing under the discretionary function exception that "the Court does not reach the government's alternative argument that Mr. Gabriel's loss of consortium claim must be dismissed for failure to exhaust administrative remedies").

## IV. CONCLUSION

For the reasons set forth above, NPS's motion to dismiss is **GRANTED**, and the Complaint is **DISMISSED** for lack of subject-matter jurisdiction. An appropriate Order follows.

Dated: May 31, 2024

                                                     **GEORGETTE CASTNER**
                                                     **UNITED STATES DISTRICT JUDGE**